Meir Aaron **SCHREIBER** and Neal M. Friedfertig, Plaintiffs,

v.

**WORLDCO, LLC, Defendant.**

No. 02 Civ. 4049(DC).

United States District Court, S.D. New York.

July 9, 2004.

Kaiser Saurborn & Mair, PC by Daniel J. Kaiser, Esq., Henry L. Saurborn, Jr., Esq., New York City, for Plaintiffs.

Fulbright & Jaworski LLP by Neil G. Sparber, Esq., Kristen M. Keenan, Esq., New York City, for Defendant.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiffs Meir Aaron Schreiber and Neal M. Friedfertig allege that defendant Worldco, LLC ("Worldco") wrongfully discharged them, purportedly because of their age, in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 629 *et seq.*; the New York State Human Rights Law, New York Executive Law § 296 *et seq.*; and the New York City Human Rights Law, New York City Administrative Code §§ 8–107 and 8–502 *et seq.* Worldco moves for summary judgment dismissing the complaint. For the reasons discussed below, the motion is denied.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to plaintiffs, the non-moving parties, the facts are as follows:

### 1. *The Parties*

At all times relevant to the instant action, Worldco was a brokerage and proprietary trading firm[1] with whom proprietary traders associated and traded Worlco's capital.[2] (Schreiber Dep. at 69). The compensation of Worldco traders was based upon their profitability. (*Id.* at 69–70; Friedfertig Dep. at 61). The traders did not receive a salary and only made money if they were net profitable. (Schreiber Dep. at 69–70; Friedfertig Dep. at 61).

Schreiber was born on October 1, 1949. (Schreiber Dep. at ¶ 1). Prior to his association with Worldco, he was a practicing attorney who also traded in long-term securities for his own personal gain. (*Id.* at 7–8, 17–25). Friedfertig was born on May 20, 1949. (Friedfertig Dep. at 2). Prior to his association with Wordco, he owned a small chain of retail bookstores. After selling his book business, Friedfertig traded long-term securities for his own account. (*Id.* at 9–11). Before Worldco, neither plaintiff had day trading[3] experience.

### 2. *Plaintiffs' Affiliation with Worldco*

In June 2000, plaintiffs, who were approximately fifty years old at the time, met with Walter Bruan, the Director of Marketing for Worldco, to discuss the possibility of becoming associated with Worldco as proprietary traders. (Schreiber Dep. at 23, 28–29, 71; Friedfertig Dep. at 16–17, 28–29, 74). Bruan offered plaintiffs positions as traders, and they accepted. (Schreiber Dep. at 28–29; Friedfertig Dep. at 28–29). Also at the June 2000 meeting, Braun told plaintiffs that they would be trained by David Fielder, a senior trader who, along with his son Saul Fielder, served as a group leader for a particular group of Worldco traders (the "Fielder group"). (Schreiber Dep. at 24–26; Friedfertig Dep. at 23; David Fielder Dep. at 5).

In February 2001, eight months after being offered a trading position, Friedfertig passed the required Series 7 and Series 55 exams and began trading at Worldco. (Friedfertig Dep. at 36, 38–40). Schreiber, after passing the Series 7 and Series 55 exams, began trading at Worldco in March 2001, almost nine months after being offered a trading position. (Schreiber Dep. at 32).

After they began trading, plaintiffs made numerous inquiries of Bruan and at least one inquiry of Yvonne Beri–Walker, a Worldco human resources manager, regarding placement with the Fielder group for training. (Friedfertig Decl. at ¶ 5; Schreiber Decl. at ¶ 6).

On one occasion, in approximately April or the beginning of May 2001, Schreiber asked Saul Fielder why he was not permitted to join the Fielder group and Saul Fielder responded "that David Fielder . . . and [ ] Bruan had decided that they did not want older people in the group." (*Id.* at ¶ 8; Schreiber Dep. at 48). Saul Fielder also stated that "older persons do not

---

**1.** A proprietary trading firm "trades for direct gain instead of commission dollars. Essentially, the firm has decided to profit from the market rather than commissions from processing trades." www.investopedia.com/terms/p/proprietarytrading.asp.

**2.** In October 2003, Worldco ceased its proprietary trading operation. (Def.'s Mem. at 2).

**3.** A day trader is "[a] stock trader who holds positions for a very short time (from minutes to hours) and makes numerous trades each day. Most trades are entered and closed out within the same day." Investopedia.com/terms/d/daytrader.asp.

have the same energy level as younger persons." (Schreiber Decl. at ¶ 9). The following day, Schreiber relayed the substance of his conversation with Saul Fielder to Bruan, who said that "it was true but that he would try to get [Schreiber] into the group." (*Id.* at ¶ 10). No such placement ever occurred. (*Id.*).

On another occasion, in May or June 2001, one of Worldco's branch managers, Peter Brennan, asked Schreiber, "Are you a little tired because you're not a youngster anymore?" when he saw Schreiber put his head down on his desk. (Schreiber Dep. at 21–22, 35–36). Further, on more than one occasion Brennan (1) stated to Schreiber that "trading was a young person[']s profession," and (2) commented to Friedfertig that "when he was a trader he was young." (*Id.* at ¶ 11; Friedfertig Decl. at ¶ 8). Additionally, on another occasion, in response to Friedfertig's question, "How am I doing?" Brennan answered, "Pretty good except for your age." (Friedfertig Dep. at 81).

In June 2001, Friedfertig asked Beri–Walker why his compensation was so low. "She responded by stating that the company had to offer more money to younger employees in order to attract them." (*Id.* at ¶ 12).

### 3. *Plaintiffs' Termination from Worldco*

On August 29, 2001, when Schreiber was fifty-one years old, he was informed by Al Guido, the Director of Proprietary Trading Affairs, that he would be required to contribute $10,000 to his capital account to continue his employment. (Schreiber Decl. at ¶ 13). At that time, Schreiber's net losses aggregated $18,138.12. (Krumholtz Aff. Ex. B). Schreiber chose to resign rather than contribute the capital. (*Id.* at ¶ 13).

In October 2001, when Friedfertig was fifty-one years old, Bruan terminated his employment without providing him with an explanation for the discharge. (Friedfertig Decl. at ¶ 10). At that time, Friedfertig's net losses aggregated $8,665.14. (Krumholtz Aff. Ex. B).

Plaintiffs never received any monetary compensation while associated with Worldco because they were never net positive. (Schreiber Dep. at 73; Friedfertig Dep. at 53).

### B. *The Instant Action*

Plaintiffs filed the instant suit on May 29, 2002. The parties engaged in discovery and the instant motion for summary judgment followed.

In support of its motion, defendant argues that (1) plaintiffs cannot establish a prima facie case of age discrimination because, *inter alia,* they cannot establish that they were discharged because of their age, and (2) even if plaintiffs could establish a prima facie case of age discrimination, they could not overcome defendant's legitimate, non-discriminatory reason for termination. Specifically, defendant contends that "Schreiber and Friedfertig's services were terminated as part of a company-wide downsizing concurrent with the stock market downturn, along with their poor performance as traders." (Def.'s Mem. at 6).

For the reasons set forth below, defendant's motion is denied.

### DISCUSSION

### A. *Applicable Law*

### 1. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248–49, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *accord Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

### 2. *Age Discrimination*

■ The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his or her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d

105 (2000); *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 119 (2d Cir.1997).

### a. *McDonnell Douglas Framework*

■ In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) he or she is a member of a protected class (2) who performed his or her job satisfactorily (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII); *Stratton v. Dep't for the Aging*, 132 F.3d 869, 879 (2d Cir.1997) (ADEA).

■ Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Reeves*, 530 U.S. at 143, 120 S.Ct. 2097; *Stratton*, 132 F.3d at 879.

■ Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120–21; *Connell v. Consol. Edison Co.*, 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

■ To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas'*s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James*, 233 F.3d at 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of age. *See id.* at 157; *Connell*, 109 F.Supp.2d at 207–08.

■ As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia University–College*, 999 F.Supp. 506, 513–16 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also*

*Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").[4]

### b. *Verbal Comments and Stray Remarks*

■ Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff. *See Zhang v. Barr Labs., Inc.*, 98 Civ. 5717, 2000 WL 565185, at *4, 2000 U.S. Dist LEXIS 6237, at *13 (S.D.N.Y. May 8, 2000) (citing cases). Often, however, an employer will argue that a purportedly discriminatory comment is a mere "stray remark" that does not constitute evidence of discrimination. *See, e.g., Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir.1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); *Campbell v. Alliance Nat'l Inc.*, 107 F.Supp.2d 234, 247 (S.D.N.Y.2000) (" 'Stray remarks by non-decision-makers or by decision-makers

---

4. Plaintiffs argue that the *Price Waterhouse* mixed motive analysis should be applied to their discrimination claims. (*See* Pls.' Mem. at 8). In mixed motive cases, that is, cases where both legitimate and illegitimate reasons motivated the challenged employment decision, courts use the analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *See Woodman v. WWOR–TV, Inc.*, 293 F.Supp.2d 381, 389 (S.D.N.Y.2003). Pursuant to *Price Waterhouse*, if plaintiff establishes that the decision was motivated by a prohibited discriminatory reason, the burden then shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. *Id.* at 258, 109 S.Ct.

1775; *see also Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 180 (2d Cir.1992). "To warrant a mixed motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin v. The Wyatt Co.*, 125 F.3d 55, 61 (2d Cir.1997) (citations omitted). Because I deny summary judgment under the more restrictive *McDonnell Douglas* analysis, I need not and do not decide at this juncture whether plaintiffs have provided sufficient evidence to warrant the *Price Waterhouse* analysis. *See Morris v. New York City Dept. of Sanitation*, 99 Civ. 4376, 2003 WL 1739009, at 8, 2003 U.S. Dist. LEXIS 5146, at *30–31 (S.D.N.Y. April 2, 2003).

unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.' ") (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir.1992)); *Burrell v. Bentsen*, 91 Civ. 2654, 1993 WL 535076, *8, 1993 U.S. Dist. LEXIS 18005, at *29–30 (S.D.N.Y. Dec. 21, 1993) (stray remarks in workplace, statements by non-decisionmakers, and statements by decisionmakers unrelated to decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext) (internal quotations and citation omitted).

■ In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process. *See Minton v. Lenox Hill Hosp.*, 160 F.Supp.2d 687, 694 (S.D.N.Y.2001); *Rizzo v. Amerada Hess Corp.*, 99 Civ. 0168, 2000 WL 1887533, at *5, 2000 U.S. Dist. LEXIS 18754, at *17–18 (N.D.N.Y. Dec. 29, 2000) ("An employer's discriminatory statements will rise above the level of stray remarks … when the statements are: (1) made by the decision maker or one whose recommendation is sought by the decision maker; (2) related to the specific employment decision challenged; and (3) made close in time to the decision."); *Ruane v. Continental Cas. Co.*, 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998); *Mosberger v. CPG Nutrients*, Civ. No. 01–100, 2002 WL

31477292, at *7, 2002 U.S. Dist. LEXIS 22254, at *23 (W.D.Pa. Sept. 6, 2002) ("Discriminatory stray remarks are generally considered in one of three categories— those made (1) by a non-decisionmaker; (2) by a decisionmaker but unrelated to the decision process; or (3) by a decisionmaker but temporally remote from the adverse employment decision.") (internal quotations and citations omitted).

■ Additionally, the Second Circuit has emphasized that "[a]lthough evidence of one stray comment by itself is usually not sufficient proof to show age discrimination, that stray comment may 'bear a more ominous significance' when considered within the totality of the evidence." *Carlton*, 202 F.3d at 136 (quoting *Danzer*, 151 F.3d at 56). "Even 'stray remarks in the workplace by persons who are not involved in the pertinent decision making process … may suffice to present a prima facie case,' provided those remarks evidence invidious discrimination." *Belgrave v. City of New York*, 95 Civ. 1507, 1999 WL 692034, at *29, 1999 U.S. Dist. LEXIS 13622, at *89–90 (E.D.N.Y. Aug. 31, 1999) (quoting *Ostrowski*, 968 F.2d at 182); *see also Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir.1993) (holding that statements made by non-decisionmakers were properly received "because they showed the pervasive corporate hostility towards [plaintiff] and supported her claim that she did not receive a promotion due to her employer's retaliatory animus"); *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 753 (4th Cir.1986) (holding that evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the determinations of intent and pretext").

#### c. *Same Actor Inference*

■ The Second Circuit has also noted that "when the person who made the decision to fire was the same person who made

the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent. Inc.*, 130 F.3d 553, 560 (2d Cir.1997). This is especially the case "when the firing has occurred only a short time after the hiring." *Id.; see also Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d Cir.2000) (where an individual is discharged within a relatively short time after his or her hiring, "there is a strong inference that discrimination was not a motivating factor in the employment decision"); *Emanuel v. Oliver, Wyman Co.*, 85 F.Supp.2d 321, 334 (S.D.N.Y.2000) ("no reasonable juror could conclude that defendant fired plaintiff because he was a mere eleven months older than when he was hired"); *Coleman v. Prudential Relocation*, 975 F.Supp. 234, 241 (W.D.N.Y. 1997) (no age discrimination where plaintiff hired at age 51 and discharged 14 months later).

### B. *Application*

I address plaintiffs' ADEA and state and city law claims together because "[c]laims made pursuant to the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as claims brought pursuant to the ADEA." *Molin v. Permafiber Corp.*, 01 Civ. 9279, 2002 WL 31760215, at *3, 2002 U.S. Dist. LEXIS 23674, at *9 (S.D.N.Y. Dec. 9, 2002) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000)).

At the outset, I assume that plaintiffs have made out the prima facie case required by *McDonnell Douglas*. Defendant has articulated a legitimate, nondiscriminatory reason for plaintiffs' termination, contending that "Schreiber and Friedfertig's services were terminated as part of a company-wide downsizing concurrent with the stock market downturn,

along with their poor performance as traders." (Def.'s Mem. at 6). Hence, I proceed directly to the ultimate question of whether plaintiffs have presented sufficient evidence from which a reasonable jury could find discrimination. I do so by evaluating first plaintiffs' evidence, then defendant's evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber*, 40 F.Supp.2d 516, 520 (S.D.N.Y.1999), *aff'd mem.*, 201 F.3d 432 (2d Cir.1999); *Lapsley*, 999 F.Supp. at 515.

### 1. *Plaintiffs' Evidence*

Plaintiffs offer the following evidence in support of their age discrimination claims:

First, when Schreiber asked Saul Fielder why he was not permitted to join the Fielder group, Saul Fielder responded that "David Fielder ... and [ ] Bruan had decided that they did not want older people in the group," and "older persons do not have the same energy level as younger persons" (Schreiber Decl. at ¶¶ 8, 9);

Second, upon hearing of the conversation, Braun told Schreiber that "it was true but that he would try to get [Schreiber] into the group" (*id.* at ¶ 10);

Third, on one occasion Brennan asked Schreiber, "Are you a little tired because you're not a youngster anymore?" when he saw Schreiber put his head down on his desk (Schreiber Dep. at 35–36);

Fourth, on more than one occasion Brennan told Schreiber that "trading was a young person[']s profession" (*id.* at ¶ 11);

Fifth, on more than one occasion Brennan commented to Friedfertig that "when he was a trader he was young" (Friedfertig Decl. at ¶ 8);

Sixth, in response to Friedfertig's question, "How am I doing?" Brennan answered, "Pretty good except for your age" (Friedfertig Dep. at 81);

Seventh, when Friedfertig asked Beri–Walker why his compensation was so low, she stated that "the company had to offer more money to younger employees in order to attract them" (*id.* at ¶ 12);

Eighth, plaintiffs were refused placement in the Fielder group even though Worldco policy provides for mentoring by a senior trader as part of its training program (*see* Kaiser Decl. Ex B,) (Worldco New Trader Training Program document providing that "[a]ll traders will be assigned to a senior trader in the section. The senior trader will guide you in trading the right stocks, avoiding tricky specialist, answering questions you have about trading, and watching your daily performance."); and

Ninth, "[t]he overwhelming majority (in excess of 90 percent) of Worldco traders were in their 20s and 30s" (Pls.'s Mem. at 10) (relying on Kaiser Decl., Ex. F (document containing a list of dates titled "Worldco LLC Proprietary Trader Birth Date as of Feb. 24, 2003")).

### 2. *Defendant's Evidence*

Defendant offers the following evidence in support of its motion for summary judgment:

First, plaintiffs were in the protected class at the time that they were hired, specifically, they were fifty years old (Schreiber Dep. at 71; Friedfertig Dep. at 43);

Second, plaintiffs did not have the prior work experience or educational background usually expected by Worldco, but were nevertheless offered trading positions with the company (*see* Krumholtz Aff. at ¶¶ 6, 8, 11; Bruan Dep. at 50–51 (Bruan stated that he hired plaintiffs because he wanted "to do good by two people ... who had no money and no experience in the industry ... [a]nd the reason the firm could do that is because the firm was very strong at the time"));

Third, the market declined precipitously in the nine months between when plaintiffs were first offered positions and when they actually began trading in early 2001, *e.g.,* the NASDAQ Composite dropped from 3,982 in June 2000 to 2,208 in late February 2001, a decline of nearly 45%, and defendant allowed plaintiffs to begin trading anyway (Krumholtz Aff. at ¶ 12);

Fourth, plaintiffs were provided with the same training as all other new traders (Krumholtz Aff. at ¶ 14; Schreiber Dep. at 50–52 (acknowledging that he received an orientation and computer training, and that training videos were available to Worldco traders); Bruan Dep. at 62 (testifying that not every trader was placed in a trading group));

Fifth, Schreiber received a raise in June 2001 (Schreiber Dep. at 60–61 (acknowledging that in June 2001 Worldco increased the number of shares he was permitted to purchase and the number or positions he was allowed to have open, and that his ticket charge was reduced and his compensation was raised from 55% to 80% of the net profits on a trade));

Sixth, other traders were asked to contribute capital just as Schreiber was in August 2001 (Krumholz aff. at ¶¶ 22, 23 (of the 67 traders who made capital contributions to Worldco between August and November 2001, 57 were under the age of 40; 16 made the contributions, like Schreiber, after they began trading; 7 traders that were asked to contribute capital were asked within one week of the same request of Schreiber, and several of those traders

were younger than Schreiber and were asked to contribute more money));

Seventh, the same person, Bruan, hired and discontinued plaintiffs' association with Worldco (Schreiber Dep. at 28–29; Friedfertig Dep. at 90; Krumholtz Aff. at ¶ 18 (stating that Bruan was consulted in the decision to require Schreiber to make a capital contribution));

Eighth, plaintiffs performed poorly as traders: During their time with Worldco Schreiber incurred a net loss of $18,138.12 and Friedfertig incurred a net loss of $8,665.14 (Schreiber Dep. at 73; Friedfertig Dep. at 90, 93); and

Ninth, Worldco was downsized in response to the downturn in the economy (Krumholtz Aff. at ¶ 27 (stating that within a six-month period from the time of plaintiffs' termination, 32 traders were asked to leave due to either poor performance or because Worldco was downsizing; 25 of the 32 traders let go were under the age of 40)).

### 3. *The Record As a Whole*

Considering the evidence as a whole, and resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiffs' favor, I conclude that a reasonable jury could find that plaintiffs' ages were a factor in their dismissal. Specifically, a reasonable jury could conclude that plaintiffs were denied training under circumstances supporting an inference of discrimination, and the denial of such training led to their poor performance, which ultimately led to their dismissal.

#### a. *Verbal Comments*

■ I conclude that defendant's argument that the age-based comments were stray remarks raises issues of fact for a jury to resolve. For example, Beri–Walker, a human resources manager, purportedly said to Schreiber just three months before the termination of his employment that "to attract young college graduates [Worldco] had to offer them more than [it had] to offer older people." (Schreiber Dep. at 40). The comment was allegedly made by someone in human resources just three months before termination and explicitly referenced age in the context of a discussion regarding compensation.

In addition, Saul Fielder told Schreiber that he and his father did not want "older people" in their trading group. (*Id.* at 56–58). The comment was made by an important member of the group, three or four months before Schreiber's disassociation from Worldco, and explicitly referenced age, in the context of an inquiry by Schreiber as to why he could not get into the Fielder Group. Further, the next day Bruan allegedly confirmed to Schreiber that it was true that the Fielders did not want older individuals in their group. (*Id.* at 48–49). This confirmation came from the individual primarily responsible for hiring and discharging plaintiffs and explicitly referenced age, in the context of a complaint by Schreiber that he could not get into his preferred trading group.

Considered individually, certain of the complained of comments, such as those made by Brennan, arguably would be stray remarks. Viewed collectively, however, a reasonable jury could conclude that the remarks reflected a discriminatory atmosphere and, consequently, constituted evidence of discrimination on the part of Worldco. *See Ostrowski*, 968 F.2d at 182; *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987) (evidence of discriminatory atmosphere may be relevant because it tends "to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff"). Accordingly, the weight accorded to such

remarks is a question for a jury to decide. *See, e.g., Schug v. The Pyne–Davidson Co.,* 99 Civ. 1493, 2001 WL 34312877, at *5, 2001 U.S. Dist. LEXIS 21246, at *16 (D.Conn. Dec. 10, 2001) ("[L]ike any remarks, [stray remarks] must be viewed in context, along with the specific language used and the number of times the comments were made.")

A reasonable jury could surely find a nexus between the remarks of Saul Fielder and Bruan and the employment decisions at issue. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir.1996) (an inference of discrimination may arise from "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus"); *see also Richards v. Farner–Bocken Co.,* 145 F.Supp.2d 978, 996–97 (N.D.Iowa 2001) (discriminatory comments by management level employees "may suggest a pervasively age-discriminatory attitude to employment decisions that a reasonable jury could find was also reflected in the [discharge] at issue"). To the extent that Saul Fielder's remarks could have been considered stray, such remarks were arguably no longer so once Bruan confirmed that the Fiedlers did not want older traders in their trading group. *See Azar v. TGI Friday's, Inc.,* 945 F.Supp. 485, 499 (E.D.N.Y.1996) (discriminatory comments not stray where they were made by superior who advised decisionmaker on personnel matters related to plaintiff). Because Bruan had authority over the decision to terminate plaintiffs, his "it is true" comment serves as some evidence of discrimination on the part of Worldco.

In sum, considering Brennan and Beri–Walker's remarks collectively and in combination with the age-based comments by Saul Fielder and Bruan, I conclude that a reasonable jury could find that plaintiffs have met their burden of proving that defendant's decision to terminate them was motivated, at least in part, by their age.

#### b. *Same Actor Inference*

With respect to defendant's reliance on the same actor inference, I find that the strength of this inference is diluted by the issues of fact raised with respect to the Feilders' age-based refusal to allow plaintiffs into their trading group, and the impact that refusal may have had on Bruan's decision to terminate plaintiffs. Thus, here, too, there are issues of fact for a jury to resolve.

#### c. *Plaintiffs' Poor Performance as Traders*

Although it is undisputed that plaintiff's performed poorly as traders, plaintiffs' argument that defendant's refusal to train them led to their poor performance, and defendant's response that plaintiffs received the same training as other Worldco traders also raises questions of fact for a jury to resolve. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 78 (2d Cir.2001) (plaintiff's evidence that the promise to provide her with training was made when she was hired, and that age was at least a substantial part of the motivation for the denial of training was sufficient to defeat summary judgment).

In sum, although plaintiffs' evidence is based almost entirely on their own testimony, and defendant has presented strong evidence to show that its actions were not discriminatory, plaintiffs' age discrimination claims survive this motion for summary judgment. *See Viola v. Philips Med. Sys.,* 42 F.3d 712, 716 (2d Cir.1994) ("A grant of summary judgment is only proper if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor.") (citation omitted); *Holtz,* 258 F.3d at 78 (where

plaintiff's testimony is "the only evidence in the record ascribing discriminatory intent to [defendant], and consists largely of her uncorroborated accounts of what [the individual who hired her] said," the Second Circuit "nonetheless conclude[d] that her statements raise[d] a genuine issue of fact as to the defendant's intent"). Assuming, as I must for purposes of this motion, that the age-based comments were made, I conclude that a reasonable jury could find that plaintiffs were discriminated against on the basis of their age. Hence, defendant's motion for summary judgment is denied.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is denied. The parties shall appear for a pretrial conference on August 13, 2004, at 10:30 a.m.

SO ORDERED.